UNITED STATES of America, Plaintiff,

v.

Steve MARTELL and Stryker
International, Inc.,
Defendants.

No. 2:93–CV–116–RL.

United States District Court,
N.D. Indiana,
Hammond Division.

June 5, 1995.

Orest Szewciw, U.S. Attys. Office, Dyer, IN, Thaddeus Lightfoot, Myles E. Flint, Gregory L. Sukys, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Div., Washington, DC, for plaintiff.

Ann C. Tighe, James R. Streicker, Cotsirilos Stephenson Tighe and Streicker, Chicago, IL, for defendants.

### ORDER

LOZANO, District Judge.

This matter is before the Court on the Motion for Partial Summary Judgment on the Liability of the Estate of Steve Martell under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") filed by Plaintiff on March 18, 1994, and the Motion for Partial Summary Judgment on the Affirmative Defenses Applicable to the United States' Claim under the Comprehensive Environmental Response Compensation and Liability Act. For the reasons set forth below, Plaintiff's Motions are **GRANTED IN PART** and **DENIED IN PART.**

*BACKGROUND*

This case involves an inactive chemical and waste disposal facility located at 7537 9th Avenue in Gary, Indiana, approximately one-eighth (⅛) mile from a residential area, one-quarter (¼) mile south of the Grand Calumet River, and one and three-quarters (1¾) miles north of the Little Calumet River. (June 30, 1989, Record of Decision "ROD II", att. to Aff. of Janet Pfundheller) The site is in a low lying area with poor drainage. *Id.* Surrounding the site are interconnected ponds and wetlands. *Id.*

From 1971 to 1975, Steve Martell ("Martell"), operated this facility. (Steve Martell's Answers to Plaintiff's First Set of Interrogatories ¶ 1) From 1973 to 1975, liquid and solid chemical waste containing hazardous substances were disposed of at the site by burying the waste or discharging it to surface soil. (Answer to Complaint ¶ 10) The wastes were disposed of at the site in bulk and drum form. *Id.*

In 1975, the Indiana State Board of Health ("ISBH") inspected the site and found evidence that liquid waste had been dumped on-site. (September 30, 1988, Record of Decision "ROD I" att. w/Aff. of Janet Pfundheller) The state inspector estimated that 500,-000 gallons of liquid industrial waste had been dumped, and 1,000 drums had been

buried on-site. *Id.* Later inspections revealed that the site was contaminated with portions of discarded auto batteries, drummed liquid waste, and abandoned tanker trucks. *Id.*

ISBH ordered Martell to initiate a surface cleanup of the site in 1975. *Id.* The United States Environmental Protection Agency ("EPA") issued a similar order in 1980. *Id.* On September 25, 1980, the United States sued Martell for cleanup of the site under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* On September 8, 1983, the administrator of the EPA placed the site on the National Priorities List, a national list of hazardous substance sites. *Id.*

On December 7, 1983, the United States District Court for the Northern District of Indiana entered a Partial Consent Judgment ("PCJ") under the RCRA between the United States and Defendants Martell and Stryker International, Inc. Under the terms of section VI of the PCJ, Martell was required to submit to the EPA a detailed plan for assessment of subsurface soil and groundwater contamination at the site. Additionally, the plan was to include provisions for locating buried waste at the site, identifying areas of contamination, evaluating remedial alternatives, and selecting an appropriate remedial alternative.

According to the Government, Martell advised the EPA in 1985 that he was financially unable to complete the site assessment plan required by the PCJ. Martell contested this point, arguing that he merely requested a two month extension. In any case, the EPA ultimately decided to conduct a remedial investigation and feasibility study ("RI/FS") to investigate the current nature and extent of contamination at the site and to evaluate remedial alternatives. The EPA completed the RI/FS in 1988, determining that the site

was contaminated with various CERCLA hazardous substances.[1] (ROD II Responsiveness Summary) Selected remedies for the site were announced and described in the 1988 and 1989 Record of Decisions ("ROD"). (ROD I; ROD II) The EPA selected two separate remedies for the site: The remedy selected in the 1988 ROD addresses the problem of an oil layer floating on the groundwater and seeping into wetland areas; the remedy selected in the 1989 ROD addresses other threats to the environment including contaminated soils, fill materials, stored oil, groundwater, surface water, and sediment. *Id.* On September 13, 1994, the EPA issued a ROD Amendment, which amended the remedy selected in the 1989 ROD by substituting soil vapor extraction for incineration as an element of the remedy.

On April 13, 1993, the Government filed this Complaint, alleging that Martell never submitted the site assessment plan as required by section VI and X of the PCJ. The Government also contends that he never submitted for approval a remedial plan for final measures to be taken at the site as required by sections VII and X of the PCJ. In Count One, the Government alleged that Martell was liable under 42 U.S.C. section 9607(a), section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act. The Government sought $2,000,-000 in damages for costs incurred at the site. Count Two alleged that Martell and Stryker International were liable under section X of the PCJ for the cost of the RI/FS conducted at the site by the EPA.

On March 18, 1994, the Government filed a Motion for Partial Summary Judgment on the issues of liability of Martell under CERCLA and applicability of Martell's affirmative defenses regarding the CERCLA claim. Specifically, the Government contended that the following affirmative defenses

---

1. The contaminants found in the Site's media include, but are not limited to the following CERCLA hazardous substances: Methylene chloride, acetone, 2–butanone, tetrachloroethane, tetrachloroethene, toluene, chlorobenzene, ethylbenzene, styrene, phenol, naphthalene, 2,4–dinitrotoluene, penta-chlorophenol, phenanthrene, bis(2–ethylhexyl)phthalate, 4,4–DDE, endrin, Aroclor 1242, antimony, arsenic, barium, beryllium, cadmium, magnesium, lead, cyanide, trans–1,2–dichloroethene, Aroclor 1248, Aroclor 1254, Aroclor 1260, 1,1,1–trichloroethane, 1,2,4–trichlorobenzene, dibenzofurane, fluorene, and benzo(a) anthracene (ROD II, Tables 1–1 to 1–4; attached to Pfundheller Affidavit; *see,* 40 C.F.R. § 302.4 (Table 302.4) (listing CERCLA hazardous substances).

asserted by Martell in his Answer are legally and factually insufficient:

1) The complaint fails to state a claim upon which relief can be granted; 2) The complaint is barred because Plaintiff has waived and/or is estopped from asserting its claims by its conduct in unilaterally and without good reason in fact or law rejecting the terms of the Partial Consent Judgment and wrongfully refusing to permit defendants to fully abide by the terms of Partial Consent Judgment; 3) The complaint is barred because Plaintiff breached the terms of the Partial Consent Judgment, but continued to accept its benefits; 4) The complaint is barred because the Partial Consent Judgment provides an exclusive remedy for Plaintiff to pursue and Plaintiff failed to do so; 5) The complaint is barred under the doctrine of laches; ... 8) The complaint is barred by the doctrine of unclean hands; and 9) Defendants reserve their right to amend their answer and raise any additional defenses as may become available or apparent prior to trial.

In response, Martell asserted that the PCJ precludes the Government from asserting its CERCLA claim. In the alternative, Martell contended that his affirmative defenses are legally and factually appropriate as to this claim.

On October 12, 1994, Martell's attorney filed an affidavit with this Court stating that Martell had died on September 12, 1994. On October 21, 1994, the Court granted the Government's motion to voluntarily dismiss, without prejudice, the second claim for relief. This dismissal ultimately eliminated Stryker International, Inc. as a party in this lawsuit because Stryker International, Inc. was only named as a Defendant in Count II. On December 12, 1994, the Court granted the Government's motion to substitute the Estate of Steve Martell ("the Estate") for Steve Martell as a defendant. Given this strange and unpredicted turn of events, the Court determined that a rebriefing of the partial summary judgment motions was necessary. Thus, on March 7, 1995, this court ordered the parties to rebrief these motions. Essentially, the Government makes the same arguments, asserting that the Estate of Martell can be held accountable for Martell's actions. The Estate basically adopts the arguments previously made by Martell.

*DISCUSSION*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Nebraska v. Wyoming,* —— U.S. ——, ——, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In other words, the record must reveal that no reasonable jury could find for the non-movant. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Nucor Corp. v. Aceros Y Maquilas de Occidente,* 28 F.3d 572, 583 (7th Cir.1994).

The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might effect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo,* 840 F.2d 427, 434 (7th Cir.1988) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510).

"[A] party who bears the burden of proof on a particular issue may not rest on its

pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir.1993). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be " 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

*CERCLA Liability*

The Government argues that it is entitled to summary judgment as to CERCLA liability because there are no genuine issues of material fact which dispute that Martell fit within all of the elements for establishing such liability. Further, the Government maintains that the Estate of Martell can be held liable for damages to the same extent as Martell. The Court examines each of these points in turn.

To establish liability under CERCLA section 107, the Government must show that: 1) the site is a "facility" within the meaning of CERCLA; 2) a "release" or "threatened release" of a "hazardous substance" from the site has occurred or is occurring; 3) the release has caused the Government to incur "response costs"; and 4) the Defendant falls within a class of liable persons described in subsections (a)(1)–(a)(4). 42 U.S.C.A. § 9607 (West Supp.1995).

Section 101(9) of CERCLA defines a facility as:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any con-

sumer product in consumer use or any vessel.

42 U.S.C.A. § 9601(9) (West Supp.1995). Clearly, the site fits within the definition of a "facility" as it is an inactive chemical and waste disposal location which was used from 1973 until 1975 for the disposal of liquid and solid chemical waste. *See generally* Martell (Adm.) Dep., Nov. 22, 1988). Moreover, the waste at this site includes numerous CERCLA hazardous substances. (ROD II, Tables 1–1 – 1–4, att. to Pfundheller Aff.; and 40 C.F.R. § 302.4.)

■ "Release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C.A. § 9601(22) (West Supp. 1995). A "threatened release" is a condition with the potential to result in a release. *United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 747 (W.D.Mich.1987). It is undisputed that the operations at the site amounted to "release" of hazardous substances. Indeed, the site's soil and groundwater were so contaminated that the groundwater at the site literally was transformed into "chemical soup."

■ As far as response costs, to find a defendant liable under CERCLA, this Court need only find that the Government incurred some response costs. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir. 1989); *Weyerhaeuser Corp. v. Koppers Co.*, 771 F.Supp. 1406, 1413 (D.Md.1991). The Government contends that the EPA has incurred direct and indirect response costs at the site of at least $3,971,344.77. (Decl. of Sylvester Colletti) Martell did not dispute the fact that the Government incurred some response costs in this matter. (Martell's Statement of Genuine Issues, ¶¶ 47–48.)

Finally, to establish liability under CERCLA, the Government must demonstrate that Martell fit within one of four categories of liable parties as set forth in section 107(a)(1)–(4). In relevant part, these subsections provide that CERCLA liability may attach to:

(1) the owner or operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned

or operated any facility at which such hazardous substances were disposed of.... 42 U.S.C.A. § 9607(a) (West Supp.1995). Martell disputed that he ever owned the site as he defaulted on contracts to purchase the site. (Martell Aff.) However, he did not dispute that he operated the site from 1971 to 1975. (Answer to Complaint, ¶ 10; Martell's Statement of Genuine Issues, ¶ 8) Given that Martell operated the site during the relevant time period when hazardous substances were transported to and dumped at the site, he fit within the category of liable persons.

■ Thus, there are no genuine issues of material fact as to whether Martell fits within the elements of CERCLA liability.[2] The Government next contends that a liable party's estate is liable to the same extent as the decedent. The Estate disputes this point, questioning whether it can be held liable under CERCLA at all as the Estate's beneficiaries never owned the site since Martell defaulted on various land contracts. Essentially, then, the Estate makes the argument that it does not fit into the category of liable parties under CERCLA as it is neither an owner nor an operator of the site.

Courts that have dealt with situations in which the Government seeks to hold an estate liable for the environmental wrongs of a decedent have done so with varying results. Some courts hold the estate liable under a "trust fund theory" in which the beneficiary or estate is deemed to hold the assets received from the liable party's estate in trust for the benefit of satisfying the environmental liabilities of the deceased, responsible person. *North Carolina ex rel. Howes v. Peele,* 876 F.Supp. 733, 743 (E.D.N.C.1995); *Steego Corp. v. Ravenal,* 830 F.Supp. 42, 49 (D.Mass.1993). Other courts have refused to hold beneficiaries liable if they were not involved in the activities giving rise to CERCLA liability as they were not "owners or operators" at the time of contamination, and their only connection with the property was to inherit it from the deceased responsible party. *See Chesapeake and Potomac Tel. v. Peck Iron & Metal Co.,* 814 F.Supp. 1285,

1292 (E.D.Va.1993); *Snediker Developers, Ltd. Ptsp. v. Evans,* 773 F.Supp. 984, 987 (E.D.Mich.1991). Yet, the vast majority of courts allow environmental claims to proceed against a decedent responsible party's estate with little or no comment. *See City of North Miami, Fla. v. Berger,* 828 F.Supp. 401 (E.D.Va.1993); *Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 475 (D.N.J.1992); *Soo Line R.R. Co. v. B.J. Carney & Co.,* 797 F.Supp. 1472, 1485 (D.Minn.1992).

After a review of these cases, this Court determines that the best approach for dealing with the matter at hand, where the decedent died during the pendency of this CERCLA action, is to employ the trust fund theory. As a district court in the Eastern District of North Carolina pointed out:

> [T]his theory furthers CERCLA's remedial purpose so as to ensure a responsible party bears the costs of remedying the harm associated with the disposal of hazardous waste. Where the decedent would be liable were he alive, the plaintiff should be allowed to look [to] the decedent's assets, in the hands of the estate or the estate's beneficiaries, to satisfy that liability.

*Howes,* 876 F.Supp. at 743. The Court agrees with this reasoning. Moreover, this Court believes that the trust fund approach does not, as the proverb goes, force the son to bear the iniquity of the father. First of all, the Estate is only liable to the extent of the decedent's remaining assets. Second, the Estate never would have had access to such assets in the first place if Martell had lived and was required to pay back the Government for its response costs. To allow the Estate to escape liability, would be granting a windfall to Martell's beneficiaries. Thus, given the broad remedial purpose of CERCLA, coupled with other equitable factors, this Court concludes that the Estate is liable under CERCLA to the extent that Martell was liable under CERCLA.

Even with such a conclusion, the Estate asserts that the Government is not entitled to summary judgment as the Estate has

2. As the Government clearly states a cause of action under CERCLA, the Estate's affirmative defense # 2 (failure to state a claim upon which relief can be granted) is without legal merit.

several valid defenses against this CERCLA suit. The Court will examine the defenses relating the Partial Consent Judgment separately from the other affirmative defenses.

*Partial Consent Judgment*

The Estate of Martell argues that the Government is not entitled to summary judgment as the PCJ estops and bars the Government from bringing a CERCLA claim. Essentially, the Estate asserts that the PCJ has res judicata effect.[3] In the alternative, the Estate contends that the contractual nature of the PCJ precludes the CERCLA action or at least requires the Government to show that Martell committed a material breach of the PCJ before bringing another action.

■ Consent decrees and judgments are unique creatures in the legal environment. They " 'have attributes both of contracts and of judicial decrees,' a dual character that has resulted in different treatment for different purposes." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986) (quoting *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 237 n. 10, 95 S.Ct. 926, 935 n. 10, 43 L.Ed.2d 148 (1975)). Typically, a consent decree will bar a new lawsuit arising from the same dispute in which the decree was entered. *United States v. Fisher,* 864 F.2d 434, 439 (7th Cir. 1988); *United States v. Environmental Waste Control, Inc.,* 710 F.Supp. 1172, 1200 (N.D.Ind.1989).

However, the Seventh Circuit acknowledged in *United States v. Fisher,* 864 F.2d at 439, that there are exceptions to this general rule, particularly when the matter involves environmental issues. In *Fisher,* the defendant had been burying drums containing hazardous waste on a portion of defendant's land. *Id.* at 436. Groundwater tests revealed contamination from various toxic substances. *Id.* Thus, the EPA filed suit against the defendant and his corporation in 1980 under RCRA, seeking equitable relief against any handling, treatment, disposal, etc. of hazardous waste at the site. *Id.* Then, in 1982, the defendant and the EPA agreed to entry of a consent decree, under which the defendant would monitor the groundwater at three test wells. *Id.* The decree further authorized that "based on testing results or the receipt of new evidence, [the EPA could] apply to the court for additional relief as appears necessary to protect human life or the environment." *Id.*

After the entry of the consent decree, the defendant's site was placed on the EPA's National Priorities List, a list of the nation's most hazardous toxic waste sites. *Id.* at 437. Once the defendant's site made the National Priorities List, the EPA conducted additional tests at the site to determine whether further cleanup measures, beyond those provided in the consent decree, were necessary. *Id.* After visiting the site, the EPA's manager for the remedial project reported that the EPA needed greater access to the site than the consent decree authorized. *Id.* When the defendant refused to allow the additional access sought at the site, the EPA filed a new lawsuit against the defendant under CERCLA. *Id.* The defendant argued that CERCLA suit was barred by the consent decree in the earlier RCRA suit. *Id.* at 439.

The Seventh Circuit, while noting that a consent decree generally bars a new lawsuit arising from the same dispute which underlay the litigation in which the decree was entered, indicated that certain cases call for different treatment. *Id.* The Seventh Circuit reasoned that the CERCLA action in *Fisher* was not barred by res judicata for a couple of reasons. First, the Seventh Circuit pointed out that "there is no indication that all the hazardous leakage with which the EPA is concerned occurred before the entry of the decree, and leakage occurring afterward would create a fresh cause of action."

---

3. The Government contends that Martell waived his right to assert a res judicata or preclusion defense as he failed to plead res judicata or preclusion as an affirmative defense. However, an "affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion to strike, as long as it gives plaintiff fair notice of the nature of the defense." Wright & Miller, *Federal Practice and Procedure: Civil 2d,* § 1274, p. 455–56 (1990). While affirmative defense No. 4 is not as precise as it could be, this Court believes that affirmative defense No. 4 provides the Government with fair notice that Martell (and now the Estate) was pleading res judicata as a defense to this action.

*Id.* Second, the Superfund amendments under which the CERCLA suit was filed were enacted four years after the consent decree was signed. *Id.*

While the matter at hand bears some of the same features as the *Fisher* case, there are some major distinctions which differentiate the current matter from *Fisher.* On the similarity side, the PCJ in this matter was entered into to resolve a RCRA suit. Moreover, subsequent to the entry of the PCJ, the site was named on the EPA's National Priorities List. Further, there is a possibility that the hazardous substances at the site are migrating or leaking off-site. However, the Government has failed to affirmatively demonstrate that leakage or migration was occurring off-site. The Government suggests and points to some information that speculates that hazardous material was migrating off-site, but it fails to point to any evidence indicating that the material indeed had migrated, or was immediately threatening to migrate off-site. Furthermore, the current matter is unlike the *Fisher* case in that the parties could have brought a CERCLA action prior to the time that the parties entered into the PCJ. Although the original RCRA suit was filed in 1980 (and CERCLA was not passed until 1980), the Government certainly could have amended its Complaint some time in the next three years to include a CERCLA count. *See United States v. Gurley,* 43 F.3d 1188, 1197 (8th Cir.1994). Unlike the remedy sought in the *Fisher* case, the remedy sought in the current matter was available in 1983. Thus, the fact that the Government chose not to pursue a CERCLA claim in the early 80's must be considered a strategical choice. Accordingly, this Court concludes that the current matter does not mandate the same deviation from the general rule which the Seventh Circuit applied in the *Fisher* case.

■ However, another exception to the general rule exists when there has been an express reservation of rights in a consent decree. *See, e.g. United States v. Athlone Indus., Inc.,* 746 F.2d 977, 983 n. 5 (3d Cir.1984); *Beehler v. Jeffes,* 664 F.Supp. 931, 935 (M.D.Penn.1986). Due to the "contractual" nature of consent decrees, the general legal consensus is that preclusive effects of consent decrees should be measured by the intent of the parties. *See* Wright & Miller, *Federal Practice and Procedure: Civil 2d,* § 4443 pp. 384–85 (1981); *see also May v. Parker–Abbott Transfer & Storage, Inc.,* 899 F.2d 1007, 1010 (10th Cir.1990) ("[C]onsent decrees are of a contractual nature and, as such, their terms may alter the preclusive effects of a judgment.") Thus, when the parties have expressly reserved rights in a consent decree, evidencing the parties' intent that the consent decree not have preclusive effect, then the consent decree will not be given such effect as it is not a "final" judgment. *Athlone,* 746 F.2d at 983 n. 5; *Beehler,* 664 F.Supp. at 935.

■ The Government asserts that the PCJ was not intended to be a final judgment on the merits as the United States adequately reserved its rights in the PCJ to undertake a federally financed action. In opposition, the Estate argues that the PCJ should be given preclusive effect as the Government failed to expressly reserve the right to sue Martell under CERCLA or any other action.

The following language in sections XXI, XXII, and XXVI of the PCJ is relevant to this dispute:

XXI. The parties to this Partial Consent Judgment may rely upon this Partial Consent Judgment, in whole or in part, only in this action and proceedings hereunder. It is intended that this Partial Consent Judgment, in whole or in part, shall neither create rights in nor affect rights of persons or entities who are not parties hereto. This Partial Consent Judgment shall in no way release Martell from any regulations or requirements under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* or any other applicable federal laws or regulations except that the United States enters into a covenant not to sue Martell as specifically provided in paragraph XXII ... Nothing in this Partial Consent Judgment shall be construed as a limitation on the U.S. EPA's authority to undertake a Federally financed action at the Site. The United States expressly reserves all rights of action, claims and de-

mands involving the Site against any and all parties other than Martell....

XXII. This Partial Consent Judgment constitutes a covenant not to sue Martell with respect to assessment, remedial and monitoring measures concerning subsurface and surface contamination at the Site which existed and were known to the United States prior to the effective date of this Partial Consent Judgment. Such covenant shall be effective upon termination of this Partial Consent Judgment in accordance with paragraph XXVI. Nothing herein shall be construed to release Martell from any continuing liability at law or equity for his failure to perform in accordance with this Partial Consent Judgment.

\* \* \* \* \* \*

XXVI. The provisions of this Partial Consent Judgment shall terminate upon Martell's receipt of written notice from the U.S. EPA that all assessment, remedial and monitoring measures have been successfully completed by Martell and any and all payments due and owing to the United States have been paid by Martell, or upon a determination of the Court that all assessment, remedial and monitoring measures have been successfully completed.

Clearly, the Government reserved the right to undertake a federally financed action in this matter. The question, however, is whether the Government reserved the right to seek reimbursement from Martell if it chose to exercise this right. The Estate contends that it did not as the sentence directly after the "federally financed action" clause reserved the Government's rights against "any and all parties *other than Martell.*" The Government points out, however, that the sentence prior to this clause explicitly states that Martell was not being released from compliance with RCRA or other federal laws or regulations, "except as specified in the covenant not to sue contained in section XXII." This covenant not to sue, the Government argues, only becomes effective if and when Martell fully performed his obligations under the PCJ. Even then, the covenant applied only to contamination that exist-

ed and was known to the Government at the time of the agreement.

After reviewing the PCJ in its entirety, this Court believes that the Government reserved its right to seek reimbursement from Martell. The Government explicitly indicated in the PCJ that Martell would not be released from liability under RCRA or other federal laws except as provided in the covenant not to sue. However, the Government's right to seek reimbursement appears to be tied to Martell's compliance (or noncompliance) with the PCJ. Section XXII, the covenant not to sue provision, indicates that, "nothing herein shall be construed to release Martell from any *continuing liability* at law or equity for his *failure to perform in accordance with this Partial Consent Judgment.*"

Other provisions also indicate that the parties intended for the Government to be able to bring other actions against Martell in the event that he did not comply with the PCJ. For instance, section XVII, which provides for noncompliance penalties in the event that Martell failed to comply with any schedule in the PCJ, states that "[t]hese noncompliance penalties shall be in addition to and shall not preclude the use of any other remedies or sanctions which may be available to the U.S. EPA *by reasons of Martell's noncompliance* with the provisions of this Partial Consent Judgment." Moreover, section XXIV provides that, "*[i]n the event of noncompliance* with any term of this Partial Consent Judgment, the United States retains all rights to seek from the Court any remedy, sanction or penalty which the United States may deem appropriate."

Implicit in the above provisions is the notion that Martell first must have breached the PCJ before the Government could seek additional remedies. Each provision reserved specific government rights, but it reserved these rights only if Martell was not complying with the PCJ. Thus, after reading these provisions collectively, this Court interprets the covenant not to sue to mean that the Government could bring another action against Martell (or his Estate) only if Martell did not comply with the PCJ, new contamination was discovered, or contamination was discovered which was unknown to

the Government at the time it entered into the PCJ.

Practical considerations also support the Court's interpretation. Presumably, one of the Government's foremost concerns in 1980 was to begin addressing the contamination problems at the site as quickly as possible. Therefore, it was in the Government's interest to enter into the PCJ to rectify the situation quickly rather than to become embroiled in a lengthy litigation process. Undoubtedly, however, the Government wanted to keep alternative avenues available in the event the situation changed. On the other hand, Martell also must have hoped to gain something by entering into the PCJ. Reading the PCJ to mean that the Government could sue Martell at any time, even if he was complying with the PCJ and no new contamination was discovered, simply does not make sense; Martell would have no reason to enter into an agreement with such terms. Instead, a better reading of the document, which is more consistent with the interests of the parties, is that Martell would be protected from future actions involving the site as long as he was complying with the PCJ and no new contamination was discovered.

■ Given the Court's interpretation of the PCJ, it may have preclusive effect in this action. The Government, however, submits that this defense still should fail as Martell did not fully comply with the PCJ. In particular, the Government contends that there were problems with submitting an appropriate site assessment plan and appropriately funding remedial efforts. For instance, the Government claims that the EPA advised Martell in January 1984 about a variety of deficiencies in his subsurface site investigation plan. (Boice Aff. ¶ 12) Moreover, the Government submits that as early as May 1984, there were indications that permitting problems associated with the Paxton Landfill, the major source of Martell's income, were jeopardizing his ability to finance the cleanup. (Boice Aff. ¶ 13) After several meetings, letters, and discussions with Martell, his counsel, and his project manager, the remedial project manager for the EPA, Richard Boice ("Boice"), recommended that the EPA assume responsibility for conducting the RI/FS because: 1) Martell's consultant consistently submitted deficient plans which required extensive comments and modifications; 2) permitting difficulties associated with the Paxton Landfill, and the resulting loss of income, were affecting Martell's ability to conduct the RI/FS; and 3) Martell's position that the PCJ only obligated him to $7,000 worth of work per month indicated that the completion of a quality RI/FS would take an unacceptably long time. (Boice Aff. ¶¶ 32, 37, 38) Boice's recommendation that the EPA should begin a federally financed action was approved on July 9, 1985. (Boice Aff. ¶ 32)

The Estate of Martell boisterously disputes the Government's assessment of the situation. The Estate asserts that Boice agreed to undertake and participate in a phased approach to the development and implementation of the site assessment plan rather than requiring a complete site assessment plan as specified in the PCJ. Boice "Record of Communication" 8/1/84, Exh. D to U.S. Defense Memo; Smith Aff. ¶ 13. These individual plans, according to the Estate, were timely submitted. Moreover, although corrections and revisions were ultimately made, the Estate submits that a process of suggestion and compromise or trial and error is typical for these plans and that the Government's characterization of the process if misleading. (Smith Aff. ¶¶ 19–20) The Estate also indicates that Martell provided sufficient funds for the project. (Lewis Aff.) Although he did request in February 1985 that additional work necessary to complete the RI/FS be stayed for 60 days so that he could build up additional funds, the Estate maintains that the Government agreed to consider the request and promised to discuss further possibilities with Martell's representatives before making any final decision. (Smith Aff. ¶¶ 39–40); Boice "Record of Communication" 2/4/85). However, according to the Estate, the Government never engaged in any further discussions and merely began a federal financed action. (Smith Aff. ¶¶ 42–53)

In any event, the above factual assertions demonstrate that a genuine issue of material fact exists as to whether Martell materially

breached the PCJ. The above information conflicts as to whether the parties agreed to modify the PCJ and employ a phased approach in submitting a site assessment plan. Moreover, there are factual disputes as to the "norm" in submitting such plans regarding corrections and modifications. Finally, factual disputes still exist as to whether Martell was sufficiently able to fund the project. Accordingly, this Court does not believe that the Estate's preclusion defense is void at this time.

*Equitable Defenses—Estoppel, Laches, and Unclean Hands*

In his Answer, Martell also asserted a number of equitable defenses to this CERCLA action. However, such defenses clearly have been foreclosed with the Seventh Circuit's pronouncement in *Town of Munster v. Sherwin–Williams Co.,* 27 F.3d 1268, 1270 (7th Cir.1994), that equitable defenses are insufficient and unavailable as defenses to a liability claim under CERCLA section 107. Accordingly, these defenses must be stricken as a matter of law from the Answer.

*Reservation of Right to Bring Other Defenses*

For a final affirmative defense, Martell asserted the right to bring other defenses. As the Government points out, Federal Rule of Civil Procedure 8(c) requires a defendant to assert all affirmative defenses in an Answer. Fed.R.Civ.P. 8(c). "If an affirmative defense is not pleaded it is waived ... unless an amendment to set forth the affirmative defense is properly made." *Albee Homes, Inc. v. Lutman,* 406 F.2d 11, 13 (3d Cir.1969) (quoting 2A Moore's Federal Practice ¶ 8.27[3] at 1853 (2d ed. 1968)); *see also Kelley v. Thomas Solvent Co.,* 714 F.Supp. 1439, 1452 (W.D.Mich.1989). As a district court in the Western District of Michigan pointed out, reservation of a right to bring other defenses "serves no function as is and any addition of defenses is properly achieved by the terms of the Rules described above." *Kelley,* 714 F.Supp. at 1452. Accordingly, the tenth affirmative defense in the Answer also shall be stricken.

*CONCLUSION*

For the reasons set forth above, the Government's Motions are **GRANTED IN PART** and **DENIED IN PART** as more fully described in this order. Affirmative Defense No. One, No. Five, No. Eight, and No. Nine are **STRICKEN** from the Answer.