**McKee Hargrett HAMILTON, as Administrator of the Estate of Philip Hamilton, Jr., Plaintiff,**

v.

**MECCA, INC., d/b/a Peacock's Paint Center, and Provident Indemnity Life Insurance Company, Defendants.**

No. CV 495–71.

United States District Court, S.D. Georgia, Savannah Division.

June 26, 1996.

Francis S. Exley, Savannah, Georgia, for plaintiff.

John T. McTier, Valdosta, Georgia, for Mecca.

Steven E. Scheer, Savannah, Georgia, for Provident.

## MEMORANDUM AND ORDER

NANGLE, District Judge.

Plaintiff brought the above-captioned action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, seeking benefits under a group health plan sponsored and administered by defendant, Mecca, Inc., d/b/a Peacock's Paint Center, and insured by defendant, Provident Indemnity Life Insurance Company. Plaintiff settled her claims against Provident Indemnity Life Insurance Company and a bench trial was held on her remaining claims against Mecca, Inc. Based upon the Findings of Fact and Conclusions of Law set forth below, *see* Fed.R.Civ.P. 52(a), the Court concludes that plaintiff is entitled to judgment in the amount of $24,059.32.

## FINDINGS OF FACT

Defendant, Mecca, Inc., d/b/a Peacock's Paint Center ("Mecca"), operates a number of retail paint stores across south Georgia. In late 1991, Mecca sought a group health insurance policy from defendant, Provident Indemnity Life Insurance Company ("Provident"), to insure the group health plan that Mecca offered to its employees. On January 14, 1992, Provident issued such a policy, policy number C3–1990–0000–2, effective January 1, 1992, insuring those Mecca employees who chose to participate in its group health plan.[1] Mecca is both the "administrator" and "sponsor" of the plan, as those terms are used in ERISA, 29 U.S.C. § 1002(16).[2]

On April 9, 1993, Philip Hamilton, Jr., now deceased, began working for Mecca as a salesperson in the company's Savannah retail paint store. On May 3, 1993, Mr. Hamilton completed an application for coverage under the group health policy. The application required Mr. Hamilton to answer the following question:

> Have you or your dependents in the last five years been medically treated for or diagnosed as having heart disorder, kidney or liver disorder, cancer, stroke or other

circulatory disorder, diabetes, high blood pressure, nervous or mental disorder, drug or alcohol dependency, Immunodeficiency Syndrome (AIDS) or AIDS Related Complex or any other health condition whether active or in remission?

Mecca's Exhibit W, at 3. In response to the question, Mr. Hamilton checked "No", *id.*, and did not reveal the fact that he was hospitalized on July 7, 1990, and diagnosed with what the parties have stipulated to be "severe hypertension partially controlled with p.o. Calan, ethanol abuse, history of previous supraventrical tachyarrythmias specifically atrial flutter on at least one occasion."[3] The application also contained the following provision just above the signature line:

> To the best of my knowledge, I represent that the answers I have given above are full, complete and true. I understand that misstatements, misrepresentations, or omissions on any enrollment form may result in the voiding of insurance coverage as of its effective date with no benefits payable in that event.

Mecca's Exhibit W, at 3.

On July 7, 1993, coverage began under the group policy for Mr. Hamilton, his wife and his daughter. *See* Plaintiff's Exhibit 4, at 3. The policy provided a variety of medical benefits to Mr. Hamilton and his family, as well as $15,000.00 in life insurance to Mr. Hamilton. Provident thereafter mailed a copy of the policy, insurance cards and certificate of coverage to Mecca for distribution to Mr. Hamilton. The evidence at trial indicated that, although no one at Mecca could specifically remember distributing these materials to Mr. Hamilton, it was Mecca's regular business practice to do so upon receipt of the materials from Provident.

In the summer or fall of 1993, Mecca began looking for a different group policy with lower premiums for its plan participants. However, several of the plan participants,

---

1. Unless otherwise noted, the Court uses the term "group health plan", "plan", "group health policy" and "policy" interchangeably to mean "employee welfare benefit plan", as that term is used in 29 U.S.C. § 1002.

2. *See Pretrial Stipulations*, Stip. # 41 (doc. 74); Provident Summary Policy Description, Plaintiff's Exhibit 31, at 41. The parties' pretrial stipulations are hereby incorporated in and made a part of this Memorandum and Order.

3. *See Pretrial Stipulations* Stipulation # 100.

including Mr. Hamilton, had health problems that required the insurance companies to "rate" the group policy, resulting in premiums that were essentially the same as the premiums that the participants were paying to Provident. As a result, Mecca kept the Provident group policy.

Approximately one year after Mr. Hamilton began working for Mecca, on April 5, 1994, he was hospitalized with what was subsequently diagnosed as "congestive heart failure".[4] On April 6, 1994, Mr. Hamilton's wife and plaintiff in this action, McKee Hargrett Hamilton, notified Mecca of Mr. Hamilton's hospitalization. The owner of Mecca, Gene Peacock, subsequently requested medical information about Mr. Hamilton's condition, and Mr. Hamilton's attending physician wrote two letters to Mr. Peacock indicating that Mr. Hamilton was completely and indefinitely disabled. On April 19, 1994, Mr. Peacock sent the supervisor of Mecca's Savannah store, Bobby Lloyd, to Mr. Hamilton's home to inform him that, because his disability prevented him from returning to work, his employment with Mecca had been terminated effective April 18, 1994. Mr. Peacock followed up Mr. Lloyd's visit to Mr. Hamilton's home with a letter dated April 21, 1994, indicating that his decision to terminate Mr. Hamilton as of April 18, 1994, was necessitated by Mecca's need for help at the Savannah store and the company's inability to pay Mr. Hamilton while he was unable to work. *See* Peacock's Exhibit E.

Although Mecca had officially terminated Mr. Hamilton on April 18, 1994, Lynn Patrick, Mecca's Corporate Secretary/Treasurer and employee responsible for administering its group health plan, mailed a "notice of termination" form to Provident which indicated that Mr. Hamilton had been terminated as of April 1, 1994. *See* Plaintiff's Exhibit 5. The form asked for the "Date Employee Terminated (Last Day Worked)", *id,* and Ms. Patrick testified that, after consulting with Tom Seka at Provident, she put April 1, 1994, as Mr. Hamilton's official termination date because she believed that April 1 was the last day that Mr. Hamilton had worked for Mecca. In fact, Mr. Hamilton worked partial days on both April 4 and 5, 1994, and was considered a full time employee on these dates.

On or about the date of Mr. Hamilton's termination, April 18, 1994, the drug prescription card issued to the Hamiltons under the group policy was rejected by a local pharmacy. On April 20, 1994, Mrs. Hamilton telephoned Mecca to find out why the card had been rejected and she was referred to Provident without any explanation. She thereafter telephoned Provident and spoke to Tom Seka, who informed her that her family's participation under Mecca's group policy had been terminated but that Provident could provide Mr. Hamilton with a private, individual conversion policy. On May 17, 1994, Provident issued a conversion policy that covered only Mr. Hamilton and that had a $1,000.00 deductible and monthly premiums of $275.31.[5] Mr. Hamilton subsequently terminated his conversion policy, effective July 31, 1994.

The parties have stipulated that, because Mr. Hamilton was both a full-time employee and totally disabled on his last day of work, April 5, 1994, Provident was obligated to provide him with the benefits described in § 7 of the Provident Summary Policy Description.[6] That section is entitled "Extension of Major Medical Benefits Upon Termination of Insurance While Totally Disabled", and provides:

> If an Insured Individual is Totally Disabled on the day his or her insurance ends, the insurance will be extended solely for the Illness or Injury causing that Total Disability. Such benefits will be extended only until the earliest of:
>
> A. the end of that Total Disability; or
>
> B. for 12 months from the date his or her insurance ends; or
>
> C. the payment of the maximum benefit.

Plaintiff's Exhibit 31, at 36. The parties have also stipulated that, because Mecca had 20 or more employees on its payroll during calender year 1993, Mr. Hamilton and his family were entitled to continuation coverage under the group policy pursuant to the CO-

---

4. On August 18, 1995, plaintiff died from complications related to his congestive heart disease.

5. Stipulation # 74.

6. Stipulation # 85.

BRA[7] provisions of ERISA, 29 U.S.C. §§ 1161–1167.[8] The parties have further stipulated that Provident did not provide Mr. Hamilton with coverage under § 7 of the group policy and that Mecca, as the plan sponsor and administrator, did not provide Mr. Hamilton with the statutorily-required notice of his right to elect continuation coverage under COBRA.[9] *See* 29 U.S.C. § 1166.

Mr. Hamilton did not receive notice of his rights under COBRA even though Lynn Patrick had, in May of 1993, obtained, filled out and mailed by certified mail a COBRA election form to another Peacock employee. Patrick testified that she did not understand why she had to fill out the form in 1993, that she relied upon the guidance of her agent, Tony Taylor, when she filled it out and that she regularly relied upon Mr. Taylor, as well as Tom Seka of Provident, when a question about the company's group health plan arose. Ms. Patrick further testified that the reason she did not fill out a COBRA election form for the Hamiltons is that, when she telephoned Provident after being unable to reach Tony Taylor, Mr. Seka's only instruction was to fill out a termination form; she was never instructed to fill out a COBRA election form for the Hamiltons.

Although neither party apparently recognized it, Mr. Hamilton could not have simultaneously exercised his rights under both § 7 of the policy and COBRA.[10] By its own

terms, § 7 is not triggered unless the "Insured Individual is Totally Disabled on the day his or her *insurance ends*". By definition, an election of *continuation coverage* pursuant to COBRA means that the insurance does not end.[11] Thus, Mr. Hamilton's election of COBRA coverage would have forestalled his eligibility for benefits under § 7 of the policy until his continued COBRA coverage under the policy ended. Assuming he remained totally disabled at that time, Mr. Hamilton would have then been entitled to the benefits available under § 7 of the policy.

Because the parties completely missed this issue, the Court was not presented with any direct evidence of whether Mr. Hamilton would have chosen to end his insurance and receive the limited coverage under § 7 of the policy or to elect to continue full coverage pursuant to COBRA. There are, however, a number of reasons to conclude that Mr. Hamilton would have elected continuation coverage under COBRA. First, Mr. Hamilton was obviously unaware of his rights under § 7 of the policy and continuation coverage under COBRA would have provided him cheaper and better coverage than the conversion policy that he was actually issued. Mr. Hamilton's initial monthly COBRA premiums under the group policy would have been $143.92, which is $131.39 less than the $275.31 monthly premium under the conversion policy.[12] Additionally, his deductible un-

---

**7.** Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, Title X, § 10002(a), 100 Stat. 227 (1986).

**8.** Stipulations # 9, 11, 22, 33 and 34.

**9.** Stipulation # 64.

**10.** Like so many issues in this case, the parties have completely failed to address this extremely important issue. Once counsel for plaintiff finally realized that this was an ERISA case, he proceeded under the assumption, completely wrong, that Mr. Hamilton should have gotten 12 months of free coverage under § 7 of the Policy and then six additional months of COBRA coverage for which Mr. Hamilton would have had to pay. This is incorrect. Mr. Hamilton would have been required by statute to make his CO-BRA election within 60 days of Mecca notifying him of his rights under COBRA. *See* 29 U.S.C. § 1165(1); Plaintiff's Exh. 31, § 9, at 41. Had he made this election within the 60-day period, then his coverage under the policy would not have ended, but would have continued for up to 18 months from the date of his termination,

assuming he continued to pay his premiums. *See* 29 U.S.C. §§ 1161(a), 1162(2)(A)(i), (3); Plaintiff's Exh. 31, § 9, at 40. At the end of that 18–month period (or before if Mr. Hamilton had decided to end his continuation coverage), Mr. Hamilton would, assuming he remained totally disabled, have then been entitled to the benefits described in § 7 of the policy because his insurance would have ended at that point.

**11.** Indeed, the parties have stipulated that "[w]hen one elects COBRA they are still considered part of the group plan." Stipulation # 40. *See also* 29 U.S.C. §§ 1161(a), 1162(1).

**12.** COBRA premiums for continuation coverage under a group policy can be as high as 102% of the full monthly premiums under the policy. *See* 29 U.S.C. §§ 1162(3), 1164(1). Thus, $143.92 is 102% of what Mr. Hamilton's full monthly premium would have been under the group policy through July of 1994, at which time it would have increased somewhat to $156.24, still $119.07 cheaper than the $275.31 premium un-

der the group policy was $250.00, whereas the deductible under the conversion policy was $1,000.00. Thus, had Mecca provided him with notice of his rights, Mr. Hamilton certainly would have elected continuation coverage over the conversion policy. Second, even if Mr. Hamilton had been aware of his rights under § 7 of the policy, he could have maximized his coverage under the policy by first electing 18 months of COBRA coverage and then qualifying for a further 12 months of coverage under § 7 of the policy.[13] Third, continuation coverage under COBRA would have offered him complete coverage under the policy, while § 7 would have covered only those expenses directly related to his disability.[14] Finally, and perhaps most importantly, Mr. Hamilton was never given the choice because Mecca failed to provide him with the required notice. Thus, at a time in Mr. Hamilton's life when he urgently needed these options, he was offered none. Accordingly, the Court finds as fact that, had Mecca provided Mr. Hamilton with the required notice of his right to elect continuation coverage under the group policy pursuant to CO-BRA, he would have elected such coverage.

On June 17, 1994, Mecca canceled its group insurance coverage with Provident, the cancellation being effective retroactively to June 1, 1994, and obtained a group policy from another insurer. On December 12, 1994, Mr. Hamilton wrote a letter to Mecca requesting a copy of the Provident Summary Plan Description booklet. Upon receiving Mr. Hamilton's letter, Lynn Patrick discarded the letter and did not provide Mr. Hamilton with the requested information. Consequently, Mr. Hamilton did not receive a copy of the Summary Plan Description booklet until counsel for Mecca produced the document on May 3, 1995, as part of this lawsuit. Mrs. Hamilton testified that, at the time that Mr. Hamilton was fired, they did not have a copy of the Provident Summary Policy De-

scription in their household. This testimony was undisputed and the Court finds, therefore, that the Hamiltons were, for whatever reason, without a copy of the Provident Summary Policy Description during this period.

Between April 1, 1994, and his death on August 18, 1995, Mr. Hamilton incurred medical expenses totaling $78,859.09. A number of the medical providers have since written off or reduced their bills, while other expenses were covered by Mr. Hamilton's conversion policy, and the parties stipulated at trial that the outstanding balance of the medical bills owed by Mr. Hamilton's estate is $19,059.32.

Plaintiff brought this action against the defendants ultimately alleging that the defendants wrongfully denied Mr. Hamilton coverage under the group policy and thereby violated several different provisions of ERISA and COBRA. The defendants timely filed answers denying the violations and asserting counterclaims and cross-claims. Additionally, Provident asserted as a defense to plaintiff's claims that because Mr. Hamilton failed to reveal his previous health problems in his policy application, plaintiff is barred from any recovery under the policy.

The plaintiff subsequently settled her claims against Provident for the sum of $25,-000.00. The settlement agreement provides that the $25,000.00 "shall be apportioned first to Plaintiff's claim for life insurance proceeds and the balance of said payment to Plaintiff's claim for attorneys' fees." Defendant's Exh. Z, at 3. The agreement also provides, however, that the money is payable to Mrs. Hamilton in her capacity as representative of Mr. Hamilton's estate, rather than as the beneficiary of Mr. Hamilton's life insurance policy. *Id.* By Order entered March 18,

---

der the conversion policy. *See* Stipulations # 74, 75 and 76.

**13.** Obviously, Mr. Hamilton would have had to have been totally disabled at the time that his COBRA coverage terminated. As previously set forth, however, his attending physician had already determined that he was permanently and totally disabled.

**14.** Arguably, if Mr. Hamilton could have enjoyed the benefits of § 7 without payment of policy premiums, then there would have been an incentive for him to end his insurance immediately and receive coverage under § 7. As counsel for Mecca pointed out at closing arguments, however, the life insurance provision within the group policy contains an express premium waiver but § 7 does not. This suggests that Mr. Hamilton

1996, the Court dismissed with prejudice plaintiff's claims against Provident.[15]

## CONCLUSIONS OF LAW

### I. *The Parties' Contentions*

Plaintiff contends that Mecca intentionally interfered with Mr. Hamilton's ERISA protected rights under ERISA § 510, 29 U.S.C. § 1140, and violated his due process rights under ERISA § 503, 29 U.S.C. § 1133, by firing him, denying him coverage under the group policy pursuant to § 7 of the policy and COBRA, and then failing to notify him of the reasons why his coverage under the group policy had been denied and the review procedures available to him. Plaintiff asserts that Mecca prevented Mr. Hamilton from retaining coverage under the group policy so that it could obtain a group policy with lower premiums from a different insurer, which it would have been unable to do if Mr. Hamilton, with his health problems, had retained coverage under the policy. This, according to plaintiff, constitutes intentional interference with Mr. Hamilton's ERISA protected rights and is a violation his due process rights. Plaintiff further contends that Mecca is liable for its failure to provide Mr. Hamilton with the statutorily required notice of his rights under COBRA. Based upon these violations of ERISA, plaintiff seeks recovery of the full $78,859.09 in medical expenses incurred by Mr. Hamilton from April 5, 1994, through his death. Finally, plaintiff contends that she is entitled to a total of $11,100.00 in statutory penalties pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), for Mecca's failure to supply Mr. Hamilton with a summary plan booklet for 111 days following his written request.

Mecca contends that it was Provident's sole obligation as the insurer of the group policy to provide Mr. Hamilton with coverage under the policy pursuant to § 7 of the policy and COBRA. Mecca further argues that, because plaintiff is seeking to hold it liable for Provident's obligations under these provisions, Mecca should be entitled to assert Mr. Hamilton's omissions in his policy application as a defense to these claims. According to

Mecca, Mr. Hamilton's omissions were material to the risk assumed by Provident in covering Mr. Hamilton under the policy because the conditions that Mr. Hamilton failed to reveal were the same as, or at least related to, the conditions that resulted in the medical expenses for which plaintiff seeks reimbursement. Thus, Mecca asserts that these misrepresentations prevent plaintiff's recovery pursuant to O.C.G.A. § 33–24–7(b).

Mecca further contends that it terminated Mr. Hamilton's employment, not to deny him coverage under the group policy, but because it needed a salesperson at its Savannah store and Mr. Hamilton was no longer able to fill the position. Mecca also contends that Mr. Hamilton was required to mitigate his damages by keeping his conversion policy in effect; that plaintiff's measure of damages should be the actual amount of medical expenses owed by the estate, $19,059.32, rather than the original total of $78,859.09; and that Mecca is entitled to set off against any award to plaintiff the $25,000.00 that she received in her settlement with Provident. Finally, as to plaintiff's request for $11,100.00 in statutory penalties for Mecca's failure to provide plaintiff with a copy of the summary plan booklet, Mecca contends that its failure to provide the booklet was not in bad faith and that there is, therefore, no basis for the imposition of such a penalty.

### II. *Mr. Hamilton's Omissions In His Policy Application and Mecca's Reliance Upon O.C.G.A. § 33–24–7(b)*

The omissions in Mr. Hamilton's policy application is an affirmative defense that must, under Fed.R.Civ.P. 8(c), be affirmatively pled or else waived. *See e.g., E.E.O.C. v. White and Son Enterprises,* 881 F.2d 1006, 1009, n. 4 (11th Cir.1989) (noting that the defense of a bona fide seniority system to a claim under Title VII action is an affirmative defense which must be expressly pled and included in the pre-trial order or is waived); *U.S. v. Martell,* 887 F.Supp. 1183, 1193 (N.D.Ind.1995) ("If an affirmative defense is not pleaded it is waived unless an amendment to set forth the affirmative defense is properly made."). The rationale behind this

would have been required to continue paying premiums under § 7 of the policy.

**15.** By Order entered December 12, 1995, the Court granted Provident's motion for summary judgment on Mecca's cross-claim against it.

requirement is succinctly stated by Professors Wright and Miller:

> Since an affirmative defense will defeat plaintiff's claim if it is accepted by the court, Rule 8(c), by requiring defendant to plead his defense or risk waiving it, also serves the purpose of giving the opposing party notice of the defense and an opportunity to argue why his claim should not be barred completely.

Wright & Miller, Federal Practice and Procedure: Civil 2d. § 1270, at 414. This rationale has particular application to this case because Provident affirmatively pled the defense in its answer to plaintiff's amended complaint, while Mecca did not raise the defense in any formal pleading, including the pre-trial order. Consequently, when the plaintiff settled her claims with Provident, it was reasonable to assume that the defense was no longer an issue in the case. Thus, by waiting until trial to assert the defense, Mecca waived it.

█ Even assuming, moreover, that Mecca's failure to assert the defense does not result in its waiver, Mecca is still not entitled to assert the defense. The provision of Georgia law upon which Mecca relies, O.C.G.A. § 33–24–7(b),[16] provides:

> Misrepresentations, omissions, concealment of facts, and incorrect statements *shall not prevent recovery under the policy or contract* unless:
>
> (1) Fraudulent;
>
> (2) Material either to the acceptance of the risk or to the hazard *assumed by the insurer;* or
>
> (3) *The insurer* in good faith would either not have issued the policy or contract or would not have issued a policy ... in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy ... (emphasis added)

This provision makes clear that a defense based upon an insured's omissions in a policy application can create a defense for the *insurer* when recovery is sought *under the insurance policy.* The defense created by § 33–24–7(b) is based upon the obvious proposition that it is the insurer that assumes the risk of coverage under an insurance policy and an insured's failure to reveal relevant information alters the risk undertaken by the insurer. In this case, Mecca is not the insurer of the policy and the plaintiff makes no claim against Mecca under the terms of the policy. Indeed, the parties have stipulated that *Provident,* as the insurer of the policy, was the party responsible for providing Mr. Hamilton with benefits under § 7 of the policy, and all of the plaintiff's claims against Mecca are based upon duties created under the statutory scheme of ERISA. Thus, although the measure of damages may ultimately be the same, Mecca's liability, if any, does not stem from a failure to pay benefits in accordance with the contract of insurance (i.e. the group policy) and Mecca is not, therefore, entitled to assert Mr. Hamilton's alleged misrepresentations in the policy application as a defense to plaintiff's claims.

█ Finally, even if Mecca were entitled to assert the defense, Mecca has not sustained its burden of proving[17] that Mr. Ham-

---

**16.** Mecca's reliance upon O.C.G.A. § 33–24–7(b) raises the issue (again, unaddressed by either party) of whether this state-law provision is even applicable in an ERISA case. A reasonable argument could be made that, because O.C.G.A. § 33–24–7(b) is a statute specifically regulating when an insurer is entitled to void an insurance policy based upon an insured's statements in a policy application, the question falls within the ERISA savings clause, 29 U.S.C. § 1144(b)(2)(A), and would, therefore, be governed exclusively by state law. *See e.g., Fioretti v. Massachusetts General Life Ins. Co.,* 53 F.3d 1228, 1230, n. 2 (11th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996); *Smith v. Jefferson Pilot Life Ins. Co.,* 14 F.3d 562, 569 (11th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 57,

130 L.Ed.2d 15 (1994). The Eleventh Circuit has held, however, that "federal common law", as appropriately informed by state law, governs the resolution of this issue. *Hauser v. Life General Sec. Ins. Co.,* 56 F.3d 1330, 1333 (11th Cir.1995). Importantly, in fashioning federal common law under ERISA, the Eleventh Circuit relied upon a provision of Florida insurance law, Fla.Stat. § 627.409(1), identical to O.C.G.A. § 33–24–7(b). *Id.* at 1333–34. Thus, § 33–24–7(b) comes into this case as a guide to the Court in determining federal common law.

**17.** Under Georgia law, the insurer bears the burden of proof under O.C.G.A. § 33–24–7(b), *see e.g., National Life & Accident Ins. Co. of Tennessee v. Camp,* 77 Ga.App. 667, 49 S.E.2d 670, 672

ilton's omissions prevent plaintiff's recovery. As set forth above, the policy application filled out by Mr. Hamilton required him to certify that "[t]o the best of my knowledge, I represent that the answers I have given above are full, complete and true." [18] The Eleventh Circuit recently held in a case under ERISA that the presence of such language in a policy application "shifts the focus from a determination of truth or falsity of an applicant's statements to an inquiry into whether the applicant believed the statements to be true, [and] the applicant's answers must be assessed in light of his actual knowledge or belief." *Hauser v. Life General Sec. Ins. Co.*, 56 F.3d 1330, 1334 (11th Cir.1995) (*citing William Penn Life Ins. Co. of New York v. Sands*, 912 F.2d 1359, 1363 (11th Cir.1990)).[19]

Thus, the question is not whether Mr. Hamilton's application is objectively accurate. The question is whether it was answered to the best of his knowledge, and Mecca failed to introduce any evidence of what Mr. Hamilton's actual knowledge was with respect to his medical condition at the time he completed the Provident policy application. Indeed, the only evidence offered to the Court on this issue was the medical records from Mr. Hamilton's July 7, 1990, hospital visit, *see* Mecca's Exhibit V. Based upon these records, the parties stipulated, as set forth above, that Mr. Hamilton was diagnosed with "severe hypertension partially controlled with p.o. Calan, ethanol abuse, history of previous supraventrical tachyarrythmias specifically atrial flutter on at least one occasion" during that hospital visit. The exact import of the stipulation, as well as the medical records from which it is taken, is not entirely clear to the Court (Mecca provided no explanatory evidence, such as expert testimony, as to what these medical terms mean), and Mecca clearly did not sustain its burden of proving that Mr. Hamilton's answers in the application were inconsistent with his actual knowledge of his medical conditions.

### III. Plaintiff's Claim of Intentional Interference With Mr. Hamilton's ERISA Protected Rights

■ ERISA § 510, 29 U.S.C. § 1140, is entitled, "Interference with protected rights", and it, in relevant part, provides:

It shall be unlawful for any person to discharge, fine, expel, discipline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter[.] ... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

"The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights.... A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge.... This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ..." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222–23 (11th Cir.1993) (citations omitted).

■ Thus, where an employee cannot produce direct evidence of intentional interference under § 1140, the employee can use the Title VII burden-shifting scheme to establish a prima facie case. Plaintiff concedes that she does not have any direct proof that Mecca intentionally interfered with Mr. Hamilton's ERISA rights. She asserts, however, that she has made out a prima facie case under *McDonnell Douglas* that Mecca is unable to rebut. A prima facie case of wrongful discharge under § 510 requires an initial demonstration by a preponderance of the evidence that: (1) the employee is enti-

---

(Ga.App.1948), and there is no compelling reason why the burden should be any different under ERISA.

**18.** *See* text *supra* at 1544.

**19.** As previously noted, *supra* note 13, the Court in *Hauser* relied upon a provision of Florida law

identical to O.C.G.A. § 33–24–7(b) in fashioning federal common law. Furthermore, the application at issue in *Hauser* contained a "to the best of the applicant's knowledge and belief" provision similar to the above-quoted language in the application completed by Mr. Hamilton. Thus, the Eleventh Circuit's holding in that case is directly applicable to the instant case.

tled to ERISA's protection, (2) the employee was qualified for the position, and (3) the employee was discharged under circumstances that give rise to an inference of discrimination. *Clark*, 990 F.2d at 1223. If the plaintiff makes out a prima facie case, "a presumption of discrimination is created, and the defendant must articulate a legitimate nondiscriminatory reason for its conduct." *Id.* "If the defendant provides an acceptable reason for its conduct, the presumption of discrimination disappears, and the plaintiff must demonstrate that the reason given was a mere pretext for discrimination." *Id.*

 Plaintiff has not made out a prima facie case of intentional interference because she cannot prove, under prong number 2, that Mr. Hamilton was qualified for his position when he was terminated. It is undisputed that Mr. Hamilton's congestive heart failure left him totally disabled and that he was, as a result, unable to return to his position. Thus, Mr. Hamilton could not perform the duties of his position and was, therefore, no longer qualified for the position.

 Indeed, the evidence was clear that Mecca's decision to discharge Mr. Hamilton was based solely on the fact that Mr. Hamilton could no longer fulfill the duties of his job. Both Gene Peacock, the owner of Mecca, and Bobby Lloyd, the manager of the Savannah store, testified convincingly that they simply had to have someone to take Mr. Hamilton's place at the Savannah store and that they could not afford to pay two people to do one job. Thus, even if the Court were to assume that the plaintiff had made out a prima facie case, Mecca advanced a clear and compelling non-discriminatory reason for Mr. Hamilton's discharge and plaintiff failed to prove that the reason was mere pretext.

Accordingly, the Court concludes that the plaintiff has not proven intentional interference with ERISA protected rights under § 510.[20]

## IV. Plaintiff's Claim that Mr. Hamilton's Due Process Rights Were Violated

 ERISA § 503, 29 U.S.C. § 1133 provides:

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The regulations promulgated by the Secretary of Labor to implement this statute require, among other things, that timely written notice be given to the participant setting forth the specific reasons for the denial of a claim, the specific plan provisions relied upon for the denial, a description of any additional information necessary for the participant to perfect his claim and any appropriate information as to the steps that the participant should take if he wishes further review of the claim. 29 C.F.R. 2560.503–1(e) and (f). The Third Circuit Court of Appeals has held that § 1133 requires the following:

To afford a plan participant whose claim has been denied a reasonable opportunity for full and fair review, the plan's fiduciary

---

20. At the very most, the evidence suggests that, after Mecca terminated Mr. Hamilton because he could no longer fulfill the duties of his job, it then took steps to prevent Mr. Hamilton from retaining coverage under the group policy. Although plaintiff has not even proven this by a preponderance of the evidence, assuming arguendo that she had, this type of discrimination is not actionable under § 510 because there was no employment relationship in place when these actions occurred. Section § 510 protects against only those employer actions which affect the employment relationship in a way that is intended to deny an employee a right that he would other-

wise be entitled to under ERISA or the relevant plan. *See e.g., Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan,* 24 F.3d 1491, 1503 (3rd Cir.1994); *McGath v. Auto–Body North Shore, Inc.,* 7 F.3d 665, 668–69 (7th Cir. 1993); *Deeming v. American Standard, Inc.,* 905 F.2d 1124, 1127 (7th Cir.1990); *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980). Even the term "discriminate" in § 510 has been "limited to actions affecting the employer-employee relationship ..." *Haberern,* 24 F.3d at 1503. Once Mecca had terminated Mr. Hamilton's employment, there was obviously no employer-employee relationship to be affected by Mecca's actions.

must consider any and all pertinent information reasonably available to him. The decision must be supported by substantial evidence. The fiduciary must notify the participant promptly, in writing and in language likely to be understood by laymen, that the claim has been denied with the specific reasons therefor. The fiduciary must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence. If the fiduciary allows third parties to appear personally, the same privilege must be extended to the participant.

*Grossmuller v. International Union, United Auto., Aerospace and Agric. Implement Workers of America, UAW, Local 813,* 715 F.2d 853, 857–58 (3rd Cir.1983).

Plaintiff asserts that the court in *Grossmuller* also held that, if it is determined that § 1133 has been violated, then the claimant is entitled to a full award of claimed benefits, even if the claimant is not actually entitled to the benefits under the terms of the plan. This is simply incorrect. What the court did hold in that case is that the district court had acted within its discretion in reinstating the claimant's benefits until the district court had approved a claims procedure consistent with § 1133. *Id.* at 859. In reaching this holding, the court was clear that, once the plan had an approved claims procedure, it was ultimately entitled to terminate the claimant's benefits if there was an appropriate basis for doing so. *Id.*

■■■■ Thus, courts have generally concluded that ERISA does not provide a private right of action for damages to compensate a participant for a plan's failure to comply with § 1133. *Walter v. International Ass'n of Machinists Pension Fund,* 949 F.2d 310, 316 (10th Cir.1991); *Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan,* 854 F.2d 1516, 1532 (3rd Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989). The usual procedure for a plan's breach of duty under § 1133 is remand to the plan administrator:

> Normally, where the plan administrator has failed to comply with ERISA's procedural guidelines and the plaintiff/participant has preserved his objection to the plan administrator's noncompliance, the proper course of action for the court is remand to the plan administrator for a "full and fair review."

*Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 159 (4th Cir.1993). *See also VanderKlok v. Provident Life and Acc. Ins. Co., Inc.,* 956 F.2d 610, 616–17 (6th Cir.1992) ("Because defendant Provident erroneously interpreted and applied section 1133, its denial of benefits must be reversed and this case must be remanded for a full and fair review of plaintiff's claim pursuant to section 1133(2)."). Where the resolution of a claimant's underlying claim is clear, however, remand is unnecessary. *Weaver,* 990 F.2d at 159.

■■■■ Clearly, Mr. Hamilton did not receive the sort of notice from Mecca that is required by § 1133. The Court would note, however, that there is no evidence before it that Mr. Hamilton, or plaintiff on his behalf, ever filed a formal claim for benefits in conformity with the requirements set out on the introductory page to the Provident Summary Policy Description. The filing of such a claim is generally considered a prerequisite to a claimant's action under § 1133. *See e.g., Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 180 (7th Cir.1994). More importantly, remand would obviously not serve any purpose in this case because there is no question that Mr. Hamilton should have received coverage under either § 7 of the policy or under COBRA. Thus, the procedural defects in the way in which Mr. Hamilton's claims were handled are no longer an issue in this case because there is no question that his medical expenses should have been covered under the policy. Accordingly, § 1133 does not create an independent basis of recovery for plaintiff.

## V. *Mecca's Failure to Provide Mr. Hamilton With Notice of His Rights Under COBRA*

Although plaintiff's counsel spent most of his time, and too much of the Court's time, attempting to prove due process violations and intentional interference with ERISA rights, this case is, as it always has been, simply about Mecca's failure to provide Mr. Hamilton with notice of his rights under CO-

BRA. The Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub.L. No. 99–272, Title X, § 10002(a), 100 Stat. 227 (1986), amended ERISA to provide that a participant in an ERISA group health plan that is sponsored by an employer with 20 or more employees is given the option of electing "continuation coverage" under the plan for a certain period (in this case, 18 months) following employment termination under certain conditions ("qualifying events"). 29 U.S.C. §§ 1161(a), (b), 1162(2), 1163. *See generally National Companies Health Ben. Plan v. St. Joseph's Hosp. of Atlanta, Inc.*, 929 F.2d 1558, 1567 (11th Cir. 1991). Continuation coverage under COBRA must be identical to coverage provided to all other participants under the plan, 29 U.S.C. § 1162(1), though the participant can be required to pay up to 102% of the full monthly premiums under the plan. 29 U.S.C. §§ 1162(3), 1164(1).

The responsibility of providing COBRA coverage falls exclusively upon the plan sponsor:

> The *plan sponsor* of each group health plan *shall provide*, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan. (emphasis added)

29 U.S.C. § 1161(a). The "plan sponsor" is "the employer in the case of an employee benefit plan established or maintained by a single employer ..." 29 U.S.C. § 1002(16)(B). The responsibility of providing an employee with notice of his or her rights under COBRA upon the employee's termination is delegated as follows:

> (2) the *employer* of an employee under a plan *must notify the administrator* of a qualifying event [i.e. termination] ... within 30 days ... of the date of the qualifying event ...
> (4) the *administrator* shall notify[ ] in the case of a qualifying event described in paragraph ... (2) [termination] ..., any qualified beneficiary with respect to such event, ... of such beneficiary's rights under this subsection [*within 14 days* of the date on which the administrator receives

notice of the qualifying event] ... (emphasis added)

29 U.S.C. §§ 1166(a)(1), (2), (4)(A), and (c).

Thus, Mecca, as Mr. Hamilton's employer and as the "sponsor" and "administrator" of the Provident group health insurance policy, had the exclusive duty of providing Mr. Hamilton with notice of his rights under CO-BRA within 14 days of his termination. Mr. Hamilton would then have had 60 days from the date of notification to elect to continue coverage under the group policy. *See* 29 U.S.C. §§ 1165(1), 1166(a)(4), 1167(3)(B); Plaintiff's Exh. 31, § 9, at 41.

 Mecca concedes that it failed to provide Mr. Hamilton with notice of his rights under COBRA. It suggests, however, that it should somehow be relieved of liability because its failure was not the result of any intentional action on its part but was instead simply the result of its ignorance of its duties under ERISA. The Court is not unsympathetic to Mecca's plight in this case: ERISA is a complicated statute and Mecca was clearly unaware of the duties that it had assumed as the sponsor and administrator of the Provident group policy. The short answer to this, however, is the same answer that this Court gave Mecca in granting Provident's motion for summary judgment on Mecca's cross-claim:

> The duty to notify a terminated employee of his rights under COBRA resides exclusively with the plan administrator, while the ultimate duty to assure that an employee receives COBRA benefits resides exclusively with the plan sponsor. [Mecca] served as both the plan sponsor and administrator under its group plan; thus, when it terminated Mr. Hamilton's employment, it was solely responsible for notifying Mr. Hamilton of, and providing him with, his COBRA benefits.

Order on Motion for Summary Judgment, CV 495–71, doc. # 75 (S.D.Ga. December 12, 1995). *See also St. Joseph's*, 929 F.2d at 1573, n. 15 ("[a]n ERISA-plan sponsor[ ] is charged with knowledge of every provision of ERISA [and, i]ndeed, ... is obligated, under ERISA, to determine employees' rights to continuation coverage and notify them of these rights."). It was incumbent upon Mec-

ca to know the ERISA duties and obligations that it had undertaken as the administrator and sponsor of the group policy, and the fact that it was not aware of its obligations simply does not relieve it of its liability for failing to provide Mr. Hamilton with notice of his rights under COBRA.

The extent of Mecca's liability for failing to provide Mr. Hamilton with notice of his rights under COBRA is governed by ERISA § 502(a), 29 U.S.C. § 1132(a). *St. Joseph's*, 929 F.2d at 1567, n. 12. Section 502(a) serves as the exclusive civil enforcement provision within ERISA and it is the sole means by which a plan participant or beneficiary can enforce his or her ERISA rights. *See e.g., Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 144, 111 S.Ct. 478, 485–86, 112 L.Ed.2d 474 (1990); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556–57, 95 L.Ed.2d 39 (1987); *Sanson v. General Motors Corp.*, 966 F.2d 618, 622 (11th Cir.1992). In relevant part, § 502(a) provides:

A civil action may be brought—

(1) by a participant or beneficiary—

\*　　\*　　\*　　\*　　\*　　\*

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

\*　　\*　　\*　　\*　　\*　　\*

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; ...

This provision limits a plaintiff's recovery to the contractually-defined benefits that the plaintiff has been denied under his or her ERISA plan. *See e.g., McRae v. Seafarers' Welfare Plan*, 920 F.2d 819, 822 (11th Cir. 1991); *Bishop v. Osborn Transp., Inc.*, 838 F.2d 1173, 1174 (11th Cir.1988), *cert. denied*, 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66

(1988). Accordingly, the appropriate measure of damages for Mecca's failure to provide Mr. Hamilton with notice of his right to continuation coverage under COBRA is the total amount of medical expenses that were not reimbursed as a result of Mecca's failure. *See St. Joseph's*, 929 F.2d at 1574–75 (affirming district court's award of over $1 million in damages based upon the district court's determination that the plan administrator should have provided plan beneficiaries with 36 months of COBRA continuation coverage under group health plan).

The Court has found as fact that, had Mr. Hamilton been properly notified of his rights under COBRA, he would have elected to continue his coverage under the group policy and would not, therefore, have been eligible for benefits under § 7 of the policy. Consequently, Mecca's failure to provide Mr. Hamilton with this notice deprived him of coverage under the group policy during the 16 months between the date that his employment was terminated and his death on August 18, 1995, and Mecca is clearly liable to plaintiff for Mr. Hamilton's lost coverage during this period. While it is clear that Mecca is liable for Mr. Hamilton's lost coverage during this period, the exact quantum of damages that will make plaintiff whole for this loss of coverage is less clear.

As previously set forth, the total of Mr. Hamilton's medical bills during this period was $78,859.09. Some of these expenses, however, were paid under the conversion policy. Furthermore, Mr. Hamilton would have been required to pay the monthly COBRA premiums under the group policy but would not have had to pay the more expensive monthly premiums under the conversion policy. Thus, the appropriate measure of damages would ideally be as follows: $78,589.09; less those expenses covered under the conversion policy; less the $2,462.88 in total monthly COBRA premiums that he would have had to pay for 16 months;[21] plus the $381.85 difference in monthly premiums for May, June and July of 1994 when the conversion policy was in effect.[22]

---

**21.** Mr. Hamilton would have had to pay premiums of $143.92 for April, May and June of 1994, and then premiums of $156.24 for the remaining 13 months of his life.

**22.** The monthly premium differential breaks down as $131.39 in May and June, and $119.07 in July.

Unfortunately, and in keeping with the way in which this case was tried, the Court has not been presented with any evidence of how much of Mr. Hamilton's expenses were actually paid under the conversion policy. A further complicating factor is the fact that, since Mr. Hamilton's death, many of his medical providers have written off or written down their bills, presumably because of the limited resources within Mr. Hamilton's estate to satisfy these bills.[23] Thus, as previously set forth, the total amount of medical bills currently outstanding against Mr. Hamilton's estate is only $19,059.32. Again, however, because of the lack of evidence before it, the Court does not know how much of the reduction from $78,589.09 to $19,059.32 is attributable to bills being written down or written off and how much is attributable to coverage under the conversion policy.

Because plaintiff bears the burden of proof as to damages, the lack of evidence before the Court on the question of the amount of expenses covered under the conversion policy must be construed against her. Section 502(a) is, moreover, a remedial statute intended to compensate a plaintiff for his or her actual losses. Plaintiff, as representative of Mr. Hamilton's estate, is not entitled to recover those expenses already paid under the conversion policy,[24] and an award for those expenses that have been written off would result in a windfall to the estate because the estate is not going to have to pay these expenses. Thus, based upon the evidence before it, the Court finds that $19,059.32 is the appropriate measure of damages under the circumstances of this case. Because the Court is awarding this reduced figure, it will not take into account either the monthly COBRA premiums that Mr. Hamilton would have had to pay to maintain continuation coverage or the excess premiums that he was forced to pay for the conversion policy.

23. The reduction in the medical expenses owed by Mr. Hamilton's estate is the direct result of the efforts of Mecca's counsel, Jim Elliot.

24. Although plaintiff is not entitled to recover twice for those expenses already paid under the conversion policy, plaintiff should, strictly speaking, receive the excess premiums that Mr. Hamilton had to pay while his conversion policy was in

Furthermore, the Court rejects Mecca's assertion that Mr. Hamilton had a duty to mitigate his damages by maintaining the conversion policy. "The duty to mitigate damages prevents a party who has been wronged by a breach of contract to accumulate damages by sitting idle. This duty does not permit a party to recover from a wrongdoer those damages which he could have avoided without undue risk, burden or humiliation." *Iron Workers' Local No. 25 Pension Fund v. Klassic Services, Inc.*, 913 F.Supp. 541, 546 (E.D.Mich.1996) (*citing* Calamari & Perrillo, Contracts § 14–15, at 610 (3d ed. 1987)). In order to maintain the conversion policy, Mr. Hamilton was required to pay significantly higher monthly premiums than he would have had to pay for COBRA coverage under the group policy for less coverage (a higher deductible) at a time when he and his family could ill afford these additional expenses. Clearly, this was a burden that Mr. Hamilton was not obliged to undertake in order to mitigate his damages.

The Court also rejects Mecca's contention that it is entitled to set off the $25,-000.00 paid to plaintiff pursuant to her settlement with Provident. Plaintiff's claims against Provident were separate and apart from her claims against Mecca. Mecca was solely responsible for providing Mr. Hamilton with notice of his rights under COBRA and has absolutely no basis to set off plaintiff's settlement with Provident. Accordingly, the Court concludes that Mecca is liable to plaintiff in the amount of $19,059.32 for failing to provide Mr. Hamilton with notice of his right to continuation coverage under the group policy pursuant to COBRA.

## VI. *Mecca's Liability for Failing to Supply Summary Plan Information Upon Request*

ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), provides:

force. On the other hand, strictly speaking, plaintiff's award should be reduced by the total amount of monthly premiums that Mr. Hamilton would have had to pay in order to maintain his COBRA continuation coverage under the policy. The Court has settled, however, on $19,059.32 as an appropriate compromise damage figure taking into account all of these facts.

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated....

ERISA § 502(c)(1)(B), 29 U.S.C. § 1132(c)(1)(B), in turn provides:

Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary *in the amount of up to $100 a day from the date of such failure or refusal,* and the court may in its discretion order such other relief as it deems proper. (emphasis added)

"Congress' purpose in enacting the ERISA disclosure provisions was to ensure that 'the individual participant knows exactly where he stands with respect to the plan.'" *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 118, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989) (*quoting* H.R.Rep. No. 93–533 p. 11 (1973), reprinted in 1974 U.S.C.C.A.N. 4639, 4649). In determining whether to assess a penalty under this provision, courts generally consider factors such as bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary. *See e.g., Pagovich v. Moskowitz,* 865 F.Supp. 130, 137 (S.D.N.Y. 1994). The Eleventh Circuit, however, has held that "[t]he decision to grant relief under ... § 1132(c) is committed to the discretion of the trial judge.... In exercising its discretion ... the trial court may undoubtedly consider whether a denial of information prejudiced a plaintiff, but prejudice is not a prerequisite to an award of civil penalties." *Curry v. Contract Fabricators Inc. Profit*

*Sharing Plan,* 891 F.2d 842, 847 (11th Cir. 1990) (quotations and citation omitted). Another court has characterized § 1132(c)'s $100–per–day penalty as being punitive in nature:

There is nothing in § 1132(c) which establishes monetary loss as a prerequisite to the "up to $100 a day," which is in the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the pensioner for actual loss.

*Sandlin v. Iron Workers Dist. Council of Tennessee Valley and Vicinity Pension Plan,* 716 F.Supp. 571, 574 (N.D.Ala.1988), *affirmed mem. opinion,* 884 F.2d 585 (11th Cir.1989). In *Sandlin,* the plaintiff sought $100.00 per day for the 402 days that the plan administrator did not supply the requested information. The Court, however, declined to award the full $40,200.00, deeming $15,000.00 "sufficient to accomplish the salutary purposes of the statute in this particular case." *Id.*

█ There is no dispute in this case that Mr. Hamilton made written request to Mecca on December 12, 1994, for a copy of the Provident Summary Plan Description booklet; that upon receiving the letter, Ms. Patrick read the letter and discarded it without providing Mr. Hamilton with the requested information; and that Mr. Hamilton was not provided with a copy of the Provident Summary Plan Description booklet until counsel for Mecca provided a copy on May 3, 1995, as part of this litigation. Furthermore, the Court has found that the Hamiltons were without a copy of the Provident Summary Plan Description booklet when Mecca terminated Mr. Hamilton.

This is just the sort of case where an award of penalties under § 502(c) is appropriate. The Hamiltons were without a copy of the Provident Summary Plan Description booklet and so appropriately requested a copy. It is entirely possible that, had Mecca timely provided the Mr. Hamilton with a copy of the plan booklet, Mr. Hamilton would have become aware of his COBRA rights, as well as his rights under § 7 of the policy, and could have persuaded Mecca and Provident of his entitlement to coverage under the

group policy without the necessity of initiating this action. Instead, Lynn Patrick chose to ignore Mr. Hamilton's request, requiring him to initiate this action and wait a total of 111 days to receive the requested information. Although Mecca could be required to pay as much as $11,100.00 in penalties under § 502(c) (up to $100.00 per day × 111 days), the Court concludes that an award of $5,000.00 is "sufficient to accomplish the salutary purposes of the statute in this particular case."

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law,

**IS HEREBY ORDERED** that judgment be and is entered in favor of plaintiff, McKee Hargrett Hamilton, as Administrator of the Estate of Philip Hamilton, Jr., and against defendant, Mecca, Inc., d/b/a Peacock's Paint Center, in the amount of $24,059.32.

**IT IS FURTHER ORDERED** that all other motions currently pending before this Court are hereby denied.

**IT IS FURTHER ORDERED** that any motion seeking an award of attorney's fees under ERISA shall be filed in conformity with Local Rule 54.2 within 15 days of the date of entry of judgment in this case. Any response to a motion for attorney's fees shall be filed within ten days of the date of service of the motion.